STATE FARM FIRE AND CASUALTY COMPANY
*v.* THOMAS C. QUIRT

[No. 176, September Term, 1975.]

*Decided November 6, 1975.*

The cause was argued before ORTH, C. J., and GILBERT and MELVIN, JJ.

*William R. Hymes* for appellant.

No appearance for appellee.

ORTH, C. J., delivered the opinion of the Court.

This appeal requires the construction of a contract of insurance issued by State Farm Fire and Casualty Company to Thomas C. Quirt. The appeal is from a judgment absolute in the amount of $1,000 in favor of Quirt against State Farm entered upon the verdict of a jury in the Superior Court of Baltimore City.[1] State Farm attacks the judgment, claiming that the trial judge, Levin, J:, was wrong in denying its motion for a directed verdict, and that even if the case were properly submitted to the jury, he committed reversible error in his charge to the jury. We find that the judge was correct in refusing to direct a verdict, albeit for the wrong reason. We agree that he erred in instructing the jury, but we believe that the error does not call for reversal. The challenged instructions gave State Farm more than that to which it was entitled, and, therefore, did not prejudice it. We affirm the judgment.

I

Certain facts established by the evidence adduced at the trial are undisputed. Quirt was the owner of two pieces of jewelry, a ring valued at $1200 and a brooch valued at $1150, which he kept for a time at home and later in a bank safe deposit box for several years. He had his business partner, a Mr. Shae, take them to Jack Cheslock, a retail jeweler, dealing as Cheslock's, Inc.[2] They remained in Cheslock's

---

1. The action was twice tried. At the first trial, which began 31 May 1972, the judge, Cole, J., denied a motion for a directed verdict and the jury returned a verdict in favor of Quirt against State Farm in the amourt of $1000. State Farm moved for judgment *n.o.v.* or in the alternative for a new trial. The court granted a new trial on 14 July 1972. The retrial commenced on 12 December 1974. The verdict of the jury was rendered on 13 December and judgment on verdict *nisi* entered. State Farm's motion for judgment *n.o.v.* or, in the alternative for a new trial was timely filed on 18 December 1974, as 13 December was a Friday. Maryland Rules 8 and 563. The motion was denied on 27 January 1975 and judgment on the verdict was made absolute the same day. State Farm appealed on 18 February 1975. Quirt did not file a brief or argue the appeal.

2. At one point Quirt said the jewelry was delivered to Cheslock in February 1967. In a loss claim the date given was February 1968. In a subsequent statement to State Farm's Claim Representative, Quirt said he had recorded the approximate date but did not recall it offhand. "It was, I suspect, a little less than a year previous to August 1968." Cheslock's testimony indicated he received the jewelry in February 1967. In any event, it was not disputed that the jewelry was turned over to Cheslock.

possession until August of 1968 when they were stolen in an armed robbery. Cheslock, believing that the loss was covered by his insurance, did not tell Quirt that the jewelry had been stolen until January 1969, when his insurer disclaimed liability.

At the time of the robbery, a contract of insurance, issued by State Farm to Quirt, was in effect. On 31 May 1969 Quirt filed a claim of loss with State Farm and on 9 June 1969 made a recorded statement about the matter to Robert Schwartz, State Farm's Claim Representative. The contract of insurance was a Homeowners Policy. It contained a standard clause, apparently common to such policies, concerning coverage of unscheduled personal property. Among the perils insured against was the theft of such property subject to certain provisions under "Coverage B" of the policy. We set them out in full as they are the crux of the controversy.

"COVERAGE B — UNSCHEDULED PERSONAL PROPERTY.

1. On Premises: This policy covers unscheduled personal property usual or incidental to the occupancy of the premises as a dwelling, owned, worn or used by an insured, while on the premises, or at the option of the Named Insured, owned by others while on the portion of the premises occupied exclusively by the Insured.

THIS COVERAGE DOES NOT INCLUDE: ANIMALS, BIRDS, A U T O M O B I L E S INCLUDING MIDGET AUTOMOBILES, VEHICLES LICENSED FOR ROAD USE AND AIRCRAFT; THE PROPERTY OF ROOMER'S OR BOARDERS NOT RELATED TO THE INSURED; ARTICLES CARRIED OR HELD AS SAMPLES OR FOR SALE OR FOR DELIVERY AFTER SALE OR FOR RENTAL TO OTHERS; AND PROPERTY WHICH IS SEPARATELY DESCRIBED AND

SPECIFICALLY INSURED IN WHOLE OR IN PART BY THIS OR ANY OTHER INSURANCE.

2. Away from premises: This policy also covers unscheduled personal property as described and limited, while elsewhere than on the premises, anywhere in the world, owned, worn or used by an Insured or at the option of the Named Insured, owned by a guest while in a temporary residence of, and occupied by an Insured or owned by a residence employee while actually engaged in the service of an Insured and while such property is in the physical custody of such residence employee or in a residence temporarily occupied by an Insured. PROPERTY PERTAINING TO A BUSINESS IS NOT COVERED.

THE LIMIT OF THIS COMPANY'S LIABILITY FOR SUCH PROPERTY WHILE AWAY FROM PREMISES SHALL BE AN ADDITIONAL AMOUNT OF INSURANCE EQUAL TO 10% OF THE AMOUNT SPECIFIED FOR COVERAGE B BUT IN NO EVENT LESS THAN $1,000." [3]

By letter dated 12 June 1969 State Farm notified Quirt that it would not pay the loss. It gave as the reason: "This coverage does not include: animals, birds, etc.; articles carried or held as samples or for sale or for delivery after sale etc."

On 16 October 1969 Quirt instituted an action *ex contractu* by filing a declaration against State Farm in the Superior Court of Baltimore City. State Farm pleaded the general

---

**3.** Within the frame of reference of this case, the main distinction between unscheduled personal property on the premises and away from the premises is that, with respect to the latter, liability as to amount is more limited. In Quirt's policy the limit as to unscheduled personal property was $4,000. When such property was away from the premises the limit was 10% of the amount specified for coverage, or $400, but in no event less than $1,000. As the jewelry was valued at $2,350, if it was within the ambit of Coverage B, the amount of liability was fixed at $1,000.

issue and a special plea that the policy sued on "does not cover, or provide payment for, articles carried or held as samples [or] for sale or for delivery after sale and the Plaintiff deposited the articles alleged to have been stolen with the owner of Cheslock's, Inc., where said articles were to be sold on a commission basis by the owner of Cheslock's, Inc." In due course, trial was had and judgment obtained. See note 1, *supra.*

## II

Although it was not disputed that Quirt owned the two pieces of jewelry, that he turned them over to Cheslock, and that they were stolen while in Cheslock's possession, there was conflict as to why Quirt had delivered the ring and brooch to Cheslock. The conflict emanated primarily from Quirt. In the claim of loss filed by him and in the statement shortly thereafter given Schwartz, State Farm's Claim Representative, Quirt said that Cheslock was to sell the jewelry for him.[4] At the trial, however, the substance of Quirt's testimony was that he delivered the jewelry to Cheslock for remodeling and not for sale. Cheslock's testimony did not clarify the matter. His recollection was that when the jewelry was left with him he said it would be "a shame to break the two pieces up since they were such

---

4. The claim read:

"During February 1968, I put on consignment with Mr. Jack Cheslock, Cheslock's Jewelry Store, 303 Reisterstown Road, a gold ring with 26 diamonds approximately $2^{1}/_{4}$ carots and a gold broach with 30 diamonds approximating $2^{1}/_{2}$ car. In January 1969 I decided to take back these 2 pieces. At that time Mr. Cheslock said they were stolen in a August 1968 robbery of his store, but he had not notified me because he wanted to settle with his insurance company. He now claims his insurance company will not honor the claim on these pieces and that it is my insurance companys responsibility."

The statement, after Quirt said the ring and brooch "were put on consignment with Mr. Cheslock", included this question by Schwartz and answer by Quirt:

"Q. Was this an agreement where he was just going to attempt to sell them? Was he going to make a commission on it or how was he going to work it? A. Well, he was going to sell them and anything above and beyond, excuse me just a minute. Whatever price he could get for them would, he would be allowed to sell them for. Let me see, as I remember he would reimburse me, . . . ."

nice pieces. There was some talk into remodeling into cuff links. I don't know how far we went into that. There was some talk of me possibly trying to get rid of the pieces for him, and that was about it. We actually didn't go too far in it, but there was some talk into remodeling, into cuff links, as I recall." Quirt would have had the option to accept or reject any offer to buy. Cheslock did not believe he ever showed the jewelry to anyone specifically. It was elicited that it would have taken about four weeks to complete a "total remodeling job", and the jewelry had been in Cheslock's possession about eighteen months before the robbery.

## III

In the context of State Farm's liability, the significance of whether Quirt left his jewelry with Cheslock for sale or for remodeling depends upon the meaning of the provision that coverage does not include articles held for sale. We find it clear that the ring and brooch were within the ambit of "Coverage B", whether on or away from the premises, as unscheduled personal property owned, worn, or used by the insured, Quirt. The jewelry was patently, as far as Quirt was concerned, not property pertaining to a business. Quirt's unrefuted testimony was that he had purchased the ring in the early 1960's, "1960, '61, '62", from the Stall Company in New York. "I had originally intended to give [it] to someone and I had decided against it after purchasing that. So l actually just kept it at home for some period of time. . . Until a time I had a safe deposit box to put it into", which was about 1965. The brooch was purchased in 1964 or 1965 from Cheslock. Quirt put it in the safe deposit box also. "Because I had decided that the original intent in purchasing them I had decided against that intent so I put them in the safe deposit box for safe keeping." And the loss was occasioned by a peril specifically insured against, that is "Theft, meaning any act of stealing or attempt thereat. . . ." [5] The sole question is whether the jewelry was held for sale within the contemplation of the exclusion.

---

5. State Farm Fire and Casualty Company policy no. 20-57 78 74, Thomas Quirt, insured, p. 3, "Perils Insured Against, paragraph 11." The

State Farm's view is that if unscheduled personal property is to be sold, it is excluded from Coverage B. It looks to *American Motorist Insurance Company v. Vermont,* 155 S.E.2d 675 (Ga. 1967) and urges us to accept the law expounded in that case. Albert Vermont brought the action upon a homeowner's policy issued to him to recover for the loss by theft of a large diamond which he owned and left with a jeweler for sale under a brokerage agreement. As in the policy before us there was an exclusionary clause in Vermont's policy concerning "articles carried or held as samples or for sale." The court held, at 676, that as Vermont "was trying to sell the article and maintained no other purpose for it, it came within the exclusionary provision of the policy as a matter of law, irrespective of whether it was in any way related to [Vermont's] usual occupation or business." [6] In so concluding, the court expressly rejected the contention that the phrase "articles carried or held as samples or for sale" refers only to property owned or used by the insured of a commercial nature in the conduct of his trade, occupation, or business. We, of course, are not bound by the decision of the Court of Appeals of Georgia, and we are not persuaded by it. The Georgia court thought that the exclusionary clause was unambiguous when considered literally. It observed that a similar exclusionary clause was enforced literally in *Gross v. Globe & Rutgers Fire Ins. Co.,* 142 Misc. 918, 256 N.Y.S. 570 (1932). In *Gross* the Supreme Court of New York, Appellate Term, First Department, reversed a judgment rendered on an action to recover loss under a "tourist floater" policy and dismissed the complaint on the merits in a three sentence per curiam opinion, without citation of authority or statement of reason, in which two judges of the three judge panel concurred on the

paragraph contained: ". . . and, as to Coverage B (on premises), including theft of property covered from within any bank, trust or safe deposit company, public warehouse, or occupied dwelling not owned or occupied by or rented to an Insured, in which the property covered has been placed for safekeeping."

6. The court observed: "If [Vermont] was coincidentally trying to sell the diamond while utilizing it for its usual purpose of adornment, it would be an issue of fact whether the article was held for sale or primarily for another purpose." *Id.,* at 676.

merits and the third judge dissented without filing an opinion. We quote the opinion in its entirety:

"The ring involved herein was a ladies' ring which the assured, a male person, had bought some time previously for presentation as an engagement ring. It was being carried at the time of its loss because the assured intended to sell it — the engagement having been broken. Under such circumstances it was not 'a personal effect usually carried by a tourist or a traveller,' nor was it 'personal jewelry belonging to and used or worn by the assured or a member of his family.' In any event it comes within the exception in the policy excluding 'merchandise for sale.' "

As further authority, the opinion in *Vermont* urged, "See Orren v. Iowa Mut. Liability Ins. Co., 230 N. C. 618, 54 S.E.2d 927; Ann. 80 A.L.R.2d 1289." *Orren* concerned an action to recover on a residence and outside theft policy. It was decided by the Supreme Court of North Carolina in 1949 by a per curiam opinion as follows:

"The determinate question at issue herein is as to whether the diamond ring was possessed by plaintiff or a member of his family for personal use or as a business asset held for sale. If a business asset, its loss by theft was not insured. The findings and conclusion of the judge in respect thereto were adverse to plaintiff. They are fully sustained by the record. Hence the judgment entered must be Affirmed."

The Annotation lends no support. It dealt with the "Scope and purview of clause excluding business property from the coverage of policy insuring unscheduled personal property." [7]

We, also, find the exclusionary provision to be

---

7. The opinion in *Vermont* observed with respect to the holding: "Our research discloses no authority to the contrary, and plaintiff cites none."

unambiguous, but our view of its meaning is the opposite of that of the court in *Vermont.* In determining what is covered by the terms and provisions of a contract of insurance, it is necessary to ascertain the intention of the parties, as gathered from the language employed by them, and in ascertaining that intention, the court must consider the character of the contract, its object and purpose, and the facts and circumstances surrounding the parties at the time of its execution, by which they would ordinarily be influenced in making it. *First Nat. Bk. v. Md. Cas. Co.,* 142 Md. 454, 460 (1923). We note first that the policy here is a homeowner's policy, intended to insure property related to the home. When the exclusionary provision of the policy here speaks in terms of the coverage not including ". . . the property of roomers or boarders not related to the insured; articles carried or held as samples or for sale or for delivery after sale or for rental to others; . . . ." it bespeaks of a commercial enterprise. A roomer is defined as a lodger. A lodger is a person who rents and lives in a furnished room or rooms. A boarder is one who pays a homeowner a stipulated sum for regular meals or meals and lodging.[8] The property of such persons, who are not related to the insured, is properly to be excluded from coverage of a homeowner's policy. Property "carried or held as samples" could only refer to a business enterprise, contemplating sales to be made from exhibition of the samples. The clause designating articles carried or held "for sale or for delivery after sale" · immediately followed by "or for rental to others" connotes, we think, as to both sale and rental, a business transaction. We find support in this view by the concise, explicit summary later set out: "Property pertaining to a business is not covered." [9] We find it clear, contrary to the opinion of

---

**8.** Definitions are from The American Heritage Dictionary of the English Language (1969).

**9.** The term "Business" is unambiguous. Courts have consistently held that business connotes a pursuit or occupation of a commercial or mercantile nature to obtain a livelihood. In Zurich Insurance Co. v. Friedlander, 261 Md. 612, 616-617 (1971) the Court held that "the ordinary and customary meaning [of business] is that reflected in Webster's Third New International Dictionary as 'commercial or mercantile activity customarily engaged in as a means of livelihood'. . . ."

the court in *Vermont,* that the clause, articles carried or held for sale, refers to property related to the insured's usual occupation or business. It appears to us incongruous that an article which, without question, was included under Coverage B, would immediately be excluded because the owner-insured decided to sell it, not as a business venture, but to dispose of it with some recoupment of its cost. A set of golf clubs, no longer used by a weekend golfer through frustration with his game, or discarded upon acquisition of a later model, would be, when advertised for sale, stripped of protection against loss afforded by a homeowner's policy. From the language employed and from the character of the contract, considering its object and purpose, we think that the parties here did not intend such result.

Even if Quirt's primary purpose in depositing the jewelry with Cheslock was to have it sold, a sale would be nowise related to Quirt's usual occupation or business, which according to the evidence was "the apartment building business." Quirt merely employed an ordinary means to dispose of some personal belongings. Although selling the jewelry was in furtherance of Cheslock's business, it had nothing to do with Quirt's business. The short of it is that the ring and brooch, as far as Quirt was concerned, even if turned over to Cheslock for sale, were not carried or held for sale within the contemplation of the exclusionary provision of the insurance contract issued him by State Farm. It was immaterial whether Quirt deposited the jewelry with Cheslock for sale or for remodeling. In either event the articles were personal property within the coverage afforded by the policy and without its exclusionary provisions.

## IV

Under our construction of the relevant part of the exclusionary provisions, it is manifest that the motion of State Farm for a directed verdict was properly denied. When the motion was made at the close of evidence offered by Quirt, the trial judge, in ruling, referred to *Vermont,* and, it appears, was of the opinion that the ring and brooch were

excluded from coverage if deposited with Cheslock for sale and included if deposited with Cheslock for remodeling. Considering the evidence in a light most favorable to Quirt, the party against whom the motion was made, the jewelry was left with Cheslock for remodeling. Therefore, the judge reasoned, the motion should be denied — "Now I am denying the motion strictly on the basis of resolving inferences favorably to the Plaintiff." When the motion was renewed at the close of all the evidence, it was again denied. Although no reasons were at that time stated by the judge, there is nothing to indicate that his concept had changed. Regardless of the reasons of the trial judge for denying the motion for a directed verdict, the denial was not erroneous and affords no basis to reverse the judgment.

State Farm claims that the court erred in that part of its instructions to the jury "where it was indicated that the Jury could only find a verdict for the Defendant if they found that the jewelry was being held by the jeweler primarily, or fundamentally, or directly for sale and not for remodeling or for safekeeping." Under our construction of the policy this instruction was erroneous. But it gave State Farm more than that to which it was entitled because it could not prevail even if the jewelry were deposited with Cheslock for sale. Therefore, State Farm was not prejudiced by the erroneous charge, and it provides no basis to reverse the judgment.

*Judgment affirmed; costs to be paid by appellant.*