BARBARA ELAINE PARKINSON *v.* EDWIN
WOODROW PARKINSON, JR.

[No. 1170, September Term, 1978.]

*Decided June 11, 1979.*

The cause was argued before MOORE, WILNER and MACDANIEL, JJ.

*William T. Glasgow* for appellant.

*Joel Marc Abramson,* with whom were *Talkin & Abramson* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

No one ever accused Don Quixote de la Mancha of being a practical man; but much of what he said and believed most of us nevertheless hold dear. He said, for example, what every witness in court swears or affirms: "I must speak the Truth, and nothing but the Truth. . . ." [1] He also said, as later in a different context did our nation's first President, "Honesty's the best Policy." [2] This case sorely tests that last statement, though hopefully not to the breaking point.

Barbara and Edwin Parkinson were married in 1965. By 1970 they had three children — a son and two daughters. The parties separated some time in 1975, and, by January, 1976, Barbara had acquired sufficient proof of Edwin's adultery to cause her to seek an *a vinculo* divorce on that ground. She also asked for custody of the children, alimony, and child support. The parties sparred and negotiated, and on or just prior to the day of trial on Barbara's Bill of Complaint, they reached an agreement (or thought they had reached an agreement) with respect to most of the issues collateral to the divorce itself — child custody, visitation rights, spousal and child support, and the division of property.

When they appeared in court on May 4, 1976, Edwin's counsel advised the court that the parties had arrived at "an agreement in principal (sic) on alimony, child support and

---

1. *Don Quixote de la Mancha,* Miguel de Cervantes, pt. I, bk. IV, ch. III, p. 255 (1930).
2. *Id.,* pt. II, bk. III, ch. XXXIII, p. 666. Also, Washington's Farewell Address (1796).

property settlement aspects of this case." The agreed format, to which the court consented, was as follows:

"[T]he Plaintiff [would] present its case — its portion of the case as to the liability — the allegations made, and at that time we would ask the Court to adjourn the case, and we would read into the record *the outline of the proposed settlement terms which we would then work up into an agreement to present to the Court.* And we would request it's (sic) incorporation into any decree that the Court may have." (Emphasis supplied.)

Following this announcement, Barbara took the stand and testified in support of the allegations in her Bill of Complaint — the marriage, the children, Edwin's adultery, her fidelity and affectionate nature, the lack of condonation. She also said that she had "basically entered into a general agreement" with Edwin which, at the court's request, Edwin's counsel then read into the record in the following manner:

"MR. TALKIN: If the Court please, *these would be the terms of the agreement that will be reduced to writing.* First, that the husband would pay for child support for the three children, the minor children of the parties, Two Hundred and Sixty-One Dollars per month, per child, to be paid by his paying. . . . First of all, a mortgage payment in the amount of Three Hundred and Fifty-Eight Dollars per month as to which he would be entitled to the interest and tax deductions and the balance of Four Hundred and Twenty-Five Dollars a month to be paid directly to Mrs. Parkinson. *Next the husband would convey to Mrs. Parkinson the house presently owned by the parties at 8991 Sidelong Place in Columbia, Maryland.* Mrs. Parkinson will agree that at the time such house is sold by her to pay the husband the sum of Seventy-Five Hundred Dollars, to be reflected in the agreement. The husband will pay in addition to this child support, if and when he receives commission checks on a monthly basis, the sum of

Twenty-Five Hundred Dollars [3] per month on every monthly commission check over Three Hundred Dollars or Fifty Dollars on every monthly commission check over Five Hundred Dollars. The husband would be entitled to take the children as deductions on his tax returns. The husband will have his company—that company's medical policy cover the children so long as he is able to do so under that policy. The child support which includes the Four Hundred and Twenty-Five Dollars and the Three Fifty-Eight mortgage would be reduced by the — proportionate to the reduction of Two Hundred and Sixty-One Dollars per child as each child reaches eighteen or becomes self-supporting. The wife would waive any and all claim to alimony. The husband would be entitled to reasonable visitation, to have the children with him at reasonable times, without limitation, as long as the periods were reasonable between him and the wife. The parties would agree that to mutually pay for — divide the costs of college education if they are financially able to do so. The husband would pay the court costs of these proceedings and the husband would pay Five Hundred Dollars to the wife towards her attorney fees and detective costs." (Emphasis supplied.)

This agreement obviously envisioned Barbara maintaining custody of the three children, as it provided for child support payments to Barbara and visitation privileges for Edwin.

After listening to the corroborating testimony of two other witnesses, the court announced its finding that Edwin did, in fact, commit adultery, thus entitling Barbara to an absolute divorce on that ground. The court further announced its intention to award custody of the children to Barbara, subject to Edwin's reasonable visitation rights. "And the rest," it said, "— to their support and other arrangements that have been agreed upon — I will embody that into a decree if you

---

3. This was later corrected. The figure agreed to was $25 per month on commission checks over $350.

gentlemen will get together and submit a decree incorporating these findings and the agreement."

For whatever reason or combination of reasons, this "agreement" was never reduced to writing (except to the extent that the proceedings of May 4 were ultimately transcribed by the court reporter), and no decree of divorce was ever submitted to or signed by the court. Nonetheless, for about fourteen months, most, if not all, of its terms were observed. Barbara retained custody of the children and remained in the Columbia home, and Edwin made the various payments called for in the agreement. This peaceful arrangement ended in August, 1977, when Edwin (1) who had since moved to Atlanta, Georgia, returned only two of the three children who had been visiting with him, keeping one of his daughters, (2) unilaterally reduced his child support payments to Barbara, and (3) discontinued making the mortgage payments on the Columbia home. From and after August, Edwin paid Barbara $300 a month total. As a result, Barbara's counsel, according to a subsequent Memorandum of the court, "requested that the matter be set for a hearing for the purpose of bringing the testimony up to date."

Upon this request, a hearing was held on October 11, 1977. The first order of business at this hearing was an argument over whether the "agreement" read into the record on May 4, 1976, was still in effect. Edwin's attorney referred to the "agreement" as a "stipulation", and concluded that it had been "terminated" by the passage of time. Barbara's attorney saw the "agreement" as an "agreement" and insisted that it was still binding. At that point, and with this issue still unresolved, counsel put Barbara on the stand "to bring her case to date." She did this by testifying to the continued separation, without cohabitation, since May 4, 1976, and that there was no hope of reconciliation. Her case fell apart, however, when counsel rested, and this colloquy occurred:

"THE COURT: Mrs. Parkinson, in May of last year, I found that your husband had committed adultery and that you were entitled to an absolute divorce from him on that ground. And I think your

testimony was that you had been a faithful, chaste and affectionate wife. Is that still the case?

A. At that time, yes, sir.

THE COURT: But not since?

A. I haven't lived with him for two years, sir.

THE COURT: Well do you know what I mean by faithful and chaste?

A. Yes, sir.

Q. Well have you been chaste since that hearing?

A. No, sir.

THE COURT: I take it that up until that time you had been but since then you have not. Is that right?

A. I had been up and till that time."

Barbara did, honorably, what her oath required her to do: she told the truth. But because of her candid admission that she too had committed adultery, the court felt constrained to dismiss her prayer for *a vinculo* divorce, which it did on October 18, 1977. The court reserved the question of child custody for subsequent determination, largely upon the request of Edwin's attorney.

Two weeks later — on November 2, 1977 — Barbara filed a separate action in equity for specific performance of the "agreement" read into the record at the May 4, 1976, hearing. Edwin's response to this was a demurrer.

On December 9, 1977, the parties reassembled in court to try the custody and child support issues reserved in the court's earlier ruling, but at once and throughout the proceeding, it was recognized that the resolution of these issues was, to a great degree, dependent upon whether the earlier "agreement" (which purported to settle them) would be given effect. Complicating some of this was a new agreement between the parties, blessed by the court, that the custody situation would remain as it then was: one child with Edwin, the other two with Barbara. No other determinations were made by the court at that time.

All of the court proceedings to this point had been before

Judge Macgill. On February 9, 1978, however, Judge Fischer overruled Edwin's demurrer to Barbara's Bill for Specific Performance, concluding (1) that the "agreement" was not conditioned upon the granting of a divorce, and thus there was no failure of consideration, (2) there *was* adequate consideration for the promises made by Edwin, and (3) because the "agreement" was ultimately reduced to writing (presumably by the court reporter transcribing what was said in open court), the "agreement" satisfied the requirements of the statute of frauds. Thus, Edwin was required to answer the Bill, which he subsequently did. On July 27, 1978, Judge Fischer solidified in an Order what had been decided by Judge Macgill the preceding December: he awarded permanent custody of one child to Edwin, two children to Barbara, and reserved the issue of child support for future determination.

On August 1, 1978, the parties returned to court, once again before Judge Macgill, primarily on the Bill for Specific Performance. Both parties acknowledged their expectation of securing a divorce on May 4, 1976, and, in one fashion or another, both made clear that the "agreement" they reached and allowed to be read into the record that day was in contemplation of and to facilitate the divorce. In contrast to the ruling on demurrer by Judge Fischer, Judge Macgill concluded, from the evidence presented and his own recollection of what had occurred in May, 1976, that the "agreement" was predicated upon the passage of the divorce decree, that performance of it was conditioned upon that event, and that by reason of the failure of that condition, the agreement could not and would not be enforced. Upon that basis, the court, on October 2, 1978, dismissed the bill for specific performance. This appeal followed, and in it Barbara simply asks that the agreement (in particular that part of it requiring Edwin to deed over to her his interest in the Columbia home) be specifically enforced.

It is clear, of course, that property settlement agreements between husband and wife may be conditioned upon one party or the other obtaining a divorce (*Frank v. Frank,* 203 Md. 361, 369 (1953)), and that such agreements may be specifically enforced where that remedy is otherwise appropriate (*Zouck*

*v. Zouck,* 204 Md. 285 (1954); *Faller v. Faller,* 247 Md. 631, 636 (1967)). It is also the case that these agreements are subject to and governed by the general principles of contract law (*Heinmuller v. Heinmuller,* 257 Md. 672 (1970)), including those rules dealing with the interpretation of contracts.

"The cardinal rule in the construction and interpretation of contracts," said the Court of Appeals, "is that effect must be given to the intention of the parties, unless it is inconsistent with some established principle of law." *Kasten Constr. v. Rod Enterprises,* 268 Md. 318, 328 (1973). In interpreting a contract — in attempting to ferret out the true intention of the parties — the court "places itself in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them and to judge of the meaning of the words and the correct application of the language to the things described." *Canaras v. Lift Truck Services,* 272 Md. 337, 352 (1974). *See also State Farm Fire & Cas. v. Quirt,* 28 Md. App. 603, 610 (1975): in ascertaining the intention of contracting parties "the court must consider the character of the contract, its object and purpose, and the facts and circumstances surrounding the parties at the time of its execution." If the contract (or its meaning or proper application) is at all ambiguous, "the court may consider evidence of extrinsic factors, *i.e.,* negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties." *Canaras, supra,* at 352. *See also Jones v. John S. Stubbs & Assoc.,* 243 Md. 480 (1966).

A determination as to the intention of the parties is a determination of fact, which an appellate court is not at liberty to set aside or ignore unless it concludes that the finding is clearly erroneous. Maryland Rule 1086. Although, as Judge Fischer pointed out in his ruling on demurrer, the "agreement" as read into the record did not specifically provide that it, or its constituent covenants, were expressly conditioned upon the granting of a divorce, Judge Macgill's conclusion, based upon the evidence presented to him, that it was intended to be so conditioned, and would therefore be construed as so conditioned, is certainly not clearly erroneous.

In reading the "agreement" into the record, counsel made clear that it was an agreement in principle, one which would later be refined and reduced to writing. Its ultimate purpose or manifestation was to be as part of a divorce decree; and, although such agreements are sometimes executed without reference or regard to any pending or potential divorce action, in this instance the timing, the matters contained in the "agreement", the subsequent testimony of the parties, and the contemporaneous assertions of counsel all point inescapably to the fact that this "agreement" was very much bottomed on and in contemplation of the imminent rendering of a divorce decree.

Whether or not the failure of that expectation would suffice to vitiate the "agreement" entirely on the ground of failure of consideration, it is certainly a factor that may be considered in determining the appropriateness of decreeing specific performance. The Court of Appeals said in *Zouck v. Zouck, supra,* 204 Md. 285 at 296:

> "A court of equity will not require specific performance, as a matter of course. It will evaluate the conduct of the parties, the circumstances and the equities of each particular case. It will not use its discretion to grant the remedy unless its exercise will subserve the ends of justice and the result of its assistance is fair, just and reasonable."

*See also* Pomeroy's *Specific Performance,* § 35.

The collapse of Barbara's divorce action (and her failure to prosecute another under a "non-culpatory" ground to which the defense of recrimination would not apply), coupled with the substantial interval of time that has elapsed since May, 1976, leaves the parties in a quite different posture than they were in when this pact was concluded. Whether the various covenants be considered dependent or independent (*see Stancill v. Stancill,* 41 Md. App. 335 (1979), cert. granted April 26, 1979), the bargain as contemplated cannot now be made wholly manifest. The "agreement" called for Barbara to have custody of all three children, and for Edwin to pay child support, split between the mortgage payment and cash to

Barbara, for all three. That condition has since been changed by court decree. Barbara's agreed waiver of alimony remains entirely executory, of course, until such time as a divorce is, in fact, granted. And then, the question of her entitlement might well be the subject of additional litigation should she seek to pursue it. Under the 1976 "agreement", that issue would have been settled by decree at or before the time Edwin would have had to convey his interest in the house. In short, it would not be the entire "agreement", especially the implied condition of a divorce, that would be specifically enforced, but only part of it.

These circumstances, especially in light of the intention and expectations of the parties when they made the "agreement", lead us to conclude that the court did not abuse its discretion in refusing to enter a decree of specific performance.[4]

*Judgment affirmed; appellant to pay the costs.*

---

**4.** Perhaps Don Quixote was not so impractical. Barbara has lost her quest for specific performance, but she has some rather flexible remedies under the new Marital Property Disposition Act, Courts article, §§ 3-6A-01 — 3-6A-07, that she did not have in May, 1976.