## CARLTON N. BANKS *v.* STATE OF MARYLAND

[No. 99, September Term, 1969.]

*Decided November 24, 1969.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*James P. Salmon* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *James E. Kenkel, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Appellant Banks was convicted of uttering a forged merchandise refund voucher at a court trial in the Circuit Court for Prince George's County and sentenced to five years imprisonment.[1] He contends on this appeal that because there was no proof that the voucher was forged, his conviction for uttering was improper.

The refund voucher in question was introduced in evidence at the trial. It was of the customary prenumbered type and had been executed in triplicate, with a number of blank spaces completed in handwriting, *viz.,* the store department number, the date of the voucher, the date, type and amount ($71.07) of the sale, a description of the merchandise (a lady's coat), the reason for its return ("didn't like style"), the name, address and signature of the customer (Carol Swisher), and the authorized signature of the store manager (which, though difficult to decipher, appeared to be Pete M. Jenkins). The transaction occurred at the Montgomery Wards Store in Iverson Mall Shopping Center.

The State adduced evidence showing that before a merchandise refund voucher could be issued, the mer-

---

1. Maryland Code, Article 27, Section 44, in pursuance of which the indictment was drawn, provides, in pertinent part:
   "Any person who * * * shall utter or publish as true any false, forged, altered or counterfeited * * * writing obligatory * * * shall be deemed a felon * * *."

chandise had to be returned to the department where it was purchased; that the refund voucher is then filled out in that department and the sales receipt must be attached thereto; that if the sales receipt does not accompany the transaction "then it is sent or called for a staff approval to come to the floor and okay it there"; and that there were seven staff members at the store authorized to "personally okay" any merchandise refunds without a sales receipt.

Josie Thompson, a store security officer, testified that on February 6, 1968 she observed the appellant and a woman later identified as Saundra Joyner in the Ladies Fashion Department; that appellant originally had a refund voucher and "[h]e handed it to her and he was telling her exactly what to do with it, really, and she walked up and there was some question about whether she should do it or not, and he handed the voucher to her and she did walk up and asked the cashier for a refund"; that upon inquiry being made of her, Joyner said the merchandise to be returned was in the car; and that the cashier then told Joyner that they did not cash refunds in that department and directed her to take the voucher upstairs to the cashier. Mrs. Thompson further testified that she followed appellant and Joyner upstairs where Joyner again presented the voucher. The cashier there called Robert Hartley, the Display Sales Manager and staff member, who came over and "asked them to go back down to the department"; that "[o]n the way down they jumped and started running"; and that once outside of the store, Joyner threw her purse under the car at appellant's direction, after which they were both apprehended. Joyner's purse was found to contain identification and charge plates in the name of a Mrs. Lide.

Robert Hartley testified that he was called to the cashier's cage because the refund voucher was not accompanied by the sales receipt. He stated that he was one of seven staff members authorized to "okay" any such merchandise refund vouchers; that when he looked at the voucher, he saw that it was already "okayed" by some-

one that he did not know; that the signature made him "suspicious," particularly since there were two security officers then present; that he couldn't identify the signature "at the time" and that was the reason "why we had to go back to the floor and get this straightened out."

Ronald Gray, another store security officer, testified that he thought the book in which the refund voucher had been kept had been stolen because immediately after appellant and Joyner were apprehended "I personally went back to the place where they were issued and couldn't find the book of vouchers." Gray testified that it was a part of his responsibility to check all stolen vouchers.

The appellant testified that he and Miss Joyner had come to the Mall to look for jobs; that he went to People's Drug Store while she went to Wards; that "she came back and said that she found the voucher when I was in People's Drug Store"; that "[s]he said that she found this voucher and she was going upstairs to return it to the cashier's office because it was 2-6-68 on it, and whoever lost it lost it that morning when we was at the store"; that "she took it upstairs to this Cashier's Office and gave it to the people, and the man, he just took it somewhere else"; that "she was talking to the man" when he came upstairs; that "they went downstairs and I went behind them"; and that "[t]hen she said that the man was trying to say that she stole this from this woman and that he had to check up on it, and that she said all she was trying to do was to give it to the cashier." Appellant further testified that as he followed Hartley and Miss Joyner downstairs, "that's when she started off running. She was in front. Then I walked up and I turned, went out the door and turned around and looked. That's when the woman stopped her then I think the woman asked two men to stop me. I'm not for sure." Appellant stated that he didn't run, but that he was "walking fast" because he "wanted to see where [Miss Joyner] was going."

In arguing that there was no evidence to show that

the refund voucher was forged, appellant contends that no one testified whether the signature of "Pete M. Jenkins," the staff member, was genuine or not; that Hartley's testimony that he didn't recognize the signature was not, without more, sufficient to prove that the voucher was forged, particularly since there was no showing of how long Hartley was employed at the store, nor any evidence as to his familiarity with the other authorized signatures. Appellant argues further that it was not shown whether Carol Swisher, the alleged purchaser, was a fictitious person, or whether anybody by that name lived at the address given on the refund voucher; that Security Officer Gray's testimony that the book was stolen does not, without more, prove that a voucher taken from that book was a forgery, particularly since such voucher could have been legitimately issued by the store before the book was stolen; that there was no sufficient showing that the book was stolen (if it were stolen) before or after the incident in question, but whether the book was stolen or not, the voucher could have been validly executed prior to the theft, then stolen or found.

In *Pearson v. State,* 8 Md. App. 79, we held that the elements of the crime of uttering a forged instrument under Article 27, Section 44 of the Maryland Code were that (1) the instrument must be uttered and published as true or genuine; (2) it must be known by the party uttering or publishing it that it is false, altered, forged, or counterfeited; and (3) it must be uttered with intent to defraud another person. In *Smith v. State,* 7 Md. App. 457, we held that forgery is the fraudulent making of a false writing having apparent legal significance; that the terms "forge," "falsely make," and "counterfeit," as used in Section 44, were largely synonymous and described a spurious or fictitious making relating to the genuineness of execution of an instrument. In light of these principles, it is obvious that to obtain a conviction for uttering a forged instrument, the State must adduce legally sufficient evidence that the uttered instrument was in fact a forgery. That no such evidence has

been adduced in this case is entirely clear. The testimony indicated that the refund voucher blank was itself genuine. There was no testimony or proper inferences therefrom that the writing on it, particularly the signatures of "Carol Swisher," the alleged original purchaser, and "Pete M. Jenkins," the alleged authorized staff member, were false. Gray's testimony that he thought the book in which the voucher had been kept had been stolen, coupled with Hartley's testimony that there were, in effect, seven staff members who had the responsibility of approving such vouchers, and that he couldn't "at the time" identify the manager's signature on it, is hardly legally sufficient evidence to show that those signatures were false and that the voucher was indeed a forgery. As a result, we hold that the lower court's judgment finding appellant guilty of uttering a forged instrument was clearly erroneous under Maryland Rule 1086.

*Judgment reversed, case remanded for a new trial.*