*MAS Associates, LLC, et al. v. Harry S. Korotki*, No. 57, September Term, 2018, Opinion by Adkins, J.

**CORPORATIONS AND ASSOCIATIONS – PARTNERSHIPS – INTENT TO FORM A PARTNERSHIP – COMPETENT MATERIAL EVIDENCE**: The party asserting the existence of a partnership bears the burden of producing sufficient facts to conclusively demonstrate the parties' intent to form a partnership. *See Miller v. Salabes*, 225 Md. 53, 55 (1961). Intent can be explicit or based on the parties' conduct and the surrounding circumstances. Sharing profits and losses, equal management authority, making capital contributions, and whether the parties were concurrently seeking to form another type of business entity can all be factors the courts consider when evaluating intent. Here, the trial court made an error of law when it concluded that Harry Korotki's $275,000 in payments to Saralee Greenberg were capital contributions for a new entity, and to the extent that it applied a presumption of partnership based on receipt of profits, it also made an error of law. As for the other factors and evidence, taken together, the record lacks competent material evidence to conclude the parties formed a partnership and the trial court was clearly erroneous in concluding that they did.

Circuit Court for Baltimore County
Case No.: 03-C-11-010759
Argued: March 1, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 57

September Term, 2018

MAS ASSOCIATES, LLC, et al.

v.

HARRY S. KOROTKI

Barbera, C.J.
*Greene
McDonald
Watts
Hotten
Getty,
Adkins, Sally D.,
    (Senior Judge, Specially Assigned)

JJ.

Opinion by Adkins, J.

Filed: August 8, 2019

*Greene, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.



Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

Those who run small businesses must engage in the complex concerns competing for attention that will affect the bottom line. They have little time to focus on the legal structure of their business entity, and often even less interest in doing so. But the need for clarity regarding legal structure and financial relations between parties can become acute, and business people who ignore these needs live to regret ignoring their lawyer's advice. This case can be viewed as either a business lawyer's nightmare—or a poster child for such lawyer's public relations messaging.

Today we examine the dealings of three men engaged in mortgage lending who, after initially recognizing the need for legal structure in their business relationship, failed to consummate plans for acquiring membership interests in a long-existing Limited Liability Company—and the unfortunate fall-out from that failure. The question presented is whether competent material evidence exists in the record to support the trial court's conclusion that the parties intended to form a general partnership.[1] We conclude that the evidence cannot sustain the simultaneous intent to form both an LLC and a partnership, and Respondent failed to provide competent material evidence demonstrating intent to form a partnership. Thus, we reverse the trial court's determination.

---

[1] We have slightly rephrased the question presented from the precise question granted: "Did the trial court misinterpret and misapply the Revised Uniform Partnership Act, in conflict with the LLC Act, by creating a partnership among three non-member employees of a longstanding LLC after their attempts to negotiate an amendment to the LLC's 2004 Operating Agreement with its members failed?"

## FACTUAL OVERVIEW AND PROCEDURAL POSTURE

### Factual Background

*Three Separate Entities*

Harry Korotki ("Harry"),[2] the plaintiff in the trial court, has worked in the mortgage industry in various capacities since 1991. In 1999, after the company he worked for suffered a "financial crisis," Harry had to "start over" and opened Savings First Mortgage, LLC with another individual. In 2002, this individual dissociated from Savings First, and Harry became the sole owner. By 2009, business was "very challenged," with banks "not as liberal with [credit] lines," which resulted in it becoming more difficult for "loan officers to go out and sell loans," and thereby negatively impacting profitability.

Joel Wax ("Joel"), a defendant in the trial court proceeding, was the sole owner of Greentree Mortgage Corporation. Greentree also experienced "economic difficulties" beginning around 2009.

Mark Greenberg ("Mark"), also a defendant, had also been in the mortgage industry for a significant amount of time. In 1999, after working for various other mortgage companies, Mark and his wife, Saralee Greenberg ("Saralee"), started MAS Associates, LLC ("MAS"). Saralee became a member of MAS, with a controlling 91% share of interest, and Mark became the manager and CEO and held no ownership interest. MAS was involved in three different lines of business: originating home purchase and

---

[2] In their briefs, the parties have referred to each other using first names only. For the sake of consistency and clarity, we do the same.

2

refinancing loans, selling home improvement loans, and servicing high-risk loans.  MAS was also struggling with business losses in 2009.

*Initial Conversations About Combining Entities*

In August 2009, with both of their businesses losing money, Harry and Joel engaged in negotiations with the intent to merge their companies and increase profitability.  At one point, Joel mentioned drafting a "partnership agreement" and it seems the parties anticipated sharing profits, with Harry stating that "50% of what we can generate together is a whole lot more money that [*sic*] 100% of what we are making individually."  During these conversations, Joel also stated that, "as partners," he "agree[d] that everything should be equitable."

Nevertheless, Harry and Joel's planned merger was put on hold when, in September 2009, Ken Venick ("Ken"), a member of MAS Associates, LLC who held a 9% share of interest, and Mark, expressed interest in "getting involved" in the merger.  While Saralee never authorized Mark to sign for her regarding ownership decisions nor did she give him power of attorney, he "represented [her] full interests" in the management of MAS.  Under this newly proposed scenario, it was suggested that Equity Mortgage Lending, a registered tradename for MAS Associates, LLC, was the optimal entity for "everyone to fall into . . . ."  The parties concluded that Equity Mortgage Lending was the ideal surviving entity because it had a "good track record" in the industry and fewer "legacy liabilities."

The four men then embarked anew on discussions regarding how their three companies might sensibly "merge as one business" and the potential ramifications of such an action.  A September 30, 2009 letter from Gordon, Feinblatt, Rothman, Hoffberger &

3

Hollander, LLC ("Gordon Feinblatt"), a law firm serving as "regulatory counsel" to all three entities, described this plan as one "to join forces and establish a business together in some to-be-determined manner." As part of this initial effort, Harry sent an October 1, 2009 email to a large mortgage loan originator seeking to apply for a warehouse credit line[3] for Equity Mortgage Lending. Harry characterized his interest in this new association as being a "[one-third] owner along with two other partners."

*Attempt to Become Members of MAS Associates, LLC*

Harry, Joel, and Mark held a meeting on October 13, 2009 to discuss their proposed business structure. They were joined by Elliott Cowan ("Cowan") and Marjorie Corwin ("Corwin"), the regulatory attorneys from Gordon Feinblatt, who had taken on the task of creating a "neutral" draft of the parties' business arrangement. After the meeting, Cowan prepared and circulated a summary of the meeting for review by Harry, Joel, Mark, and their personal legal representatives. This document represents the first unambiguous indication that Harry, Joel, and Mark intended to become members of MAS Associates, LLC, d/b/a Equity Mortgage Lending, replacing Saralee and diminishing Ken's ownership percentage.

---

[3] Warehouse lending is "a line of credit given to a loan originator. The funds are used to pay for a mortgage that a borrower uses to purchase property." *Warehouse Lending*, Investopedia (last updated May 23, 2019), https://www.investopedia.com/ terms/w/warehouse_lending.asp [*archived at* https://perma.cc/72VA-94YB]. "In warehouse lending, a bank handles the application and approval of a loan but obtains the funds for the loan from a warehouse lender." *Id.* Thus, it is "a means for a bank or similar institution to provide funds to a borrower without using its capital." *Id.*

During the meeting, the parties discussed the "goal" of ownership in MAS, and contemplated ownership percentages consisting of Harry at 33 1/3%, Joel at 33 1/3%, Mark at 30 1/3%, and Ken at 3%. Functionally, this would mean that Saralee, and to a lesser degree Ken, would transfer their interest in MAS to Mark, who would in turn transfer membership interest to Harry and Joel. The MAS Associates, LLC Amended and Restated Operating Agreement, adopted in April 2004 ("2004 Operating Agreement"), controlled the operation of MAS during this time. According to Section 9.1 of the 2004 Operating Agreement, such a transfer required a majority vote of the members.

The summary of the meeting indicated that the potential arrangement structured the deal into an "Interim Period" and a "Post-Interim Period." During the Interim Period, Harry and Joel were to be "employees of the Company" subject to for-cause termination and "entitled to receive W-2 compensation equal to 1/3 of the profits of the 'origination division' of the Company . . . ." Their respective companies—i.e., Savings First and Greentree—were to be liquidated and their mortgage lending licenses surrendered. Significantly, the parties never discussed "what would happen if the conditions for Harry and Joel to obtain substantial ownership [were] not obtained by the end of the Interim Period." According to Joel, the Interim Period was intended to be a time during which transitional issues, such as licensing and operations, could be ironed out.

In November 2009, Equity Mortgage Lending arranged to purchase much of Savings First's physical inventory. The parties also made plans to combine staff, and, in December 2009, they moved under one roof. During this time, Saralee authorized Harry, Joel, and Mark to be signatories on five Equity Mortgage Lending bank accounts. The

5

Bank of America paperwork formalizing this transaction denotes Mark as MAS's President and lists both Harry and Joel as Vice Presidents. Harry, Joel, and Mark also agreed to split the legal fees incurred as a result of combining their companies.

On November 25 and 27, 2009, Cowan emailed new drafts of the agreements to Harry, Joel, Mark, and their respective attorneys. The first document, which Cowan termed the "definitive agreement," outlines the interim period, before Harry, Joel, and Mark were to become members. We will refer to this agreement as the Interim Agreement. The second document—which we term the Operating Agreement Outline—contemplates each of the parties' obligations post-membership.

This draft of the Interim Agreement, similar to the provisions outlined in the initial meeting summary, provided that, as of November 30, 2009, Savings First and Greentree would surrender their licenses and discontinue originating loans and that Harry and Joel would be employees of the company for the "duration of the Approval Period." Again, the agreement stated that Harry and Joel were "entitled to receive W-2 compensation"; "one-third (1/3) of the total economic benefits enjoyed in the aggregate by Mark, Saralee, Ken, Harry, and Joel"; equivalent benefits; and "commission splits on loan originations."

The nature of the parties' relationship to MAS d/b/a Equity Mortgage Lending during this interim period is central to the litigation. Harry characterizes their association as a partnership. And it is true that, at various times via email and in other documents, the parties referred to each other as partners, and Harry's description of the parties as partners regularly went unchallenged. Still, during his testimony, Joel described himself as an "employee of MAS Associates." In fact, he understood that one of the reasons Harry and

he were employees, and not owners, was to prevent personal creditors from going after company assets. Cowan also testified that it was his "understanding that Harry and Joel were to be employees during the interim period." He stated that "the entire concept of the interim period was built around an employment relationship that[,] after the approvals were obtained and whatever other conditions there were[,] would change into a different relationship."[4]

Each party was to make a $150,000 payment to Mark, who would then gift the $450,000 to Saralee, who would make a capital contribution to MAS d/b/a Equity Mortgage Lending in that amount. The 2004 Operating Agreement defines "capital contribution" as "the total amount of cash and the fair market value of any other assets of value contributed . . . to the Company **by a Member** . . . ." (Emphasis added.) Thus, Harry, Joel, and Mark, not being MAS members, could not make direct capital contributions under the terms of the operating agreement, making an indirect route necessary to complete such a transaction. The parties indeed made these payments, although not necessarily in the precise manner described above.

On December 1, 2009, Cowan encouraged the parties to come to a final agreement by pressing them to meet. He again circulated amendments to the final documents on December 15, 2009 and recommended that the parties finalize and sign each of the

---

[4] A November 2010 warehouse credit line application to Consumers Bank lists Mark as the CEO of MAS and Harry and Joel as managers of the company. Neither Harry, Joel, nor Mark are listed as having any ownership interest. Harry was also listed as a MAS manager in the Nationwide Licensing System Consumer Access database, a national licensing system that tracks mortgage companies and loan officers.

documents by December 22, 2009. As of late-January 2010, no agreement had been reached and Ken's attorney was still raising significant areas of disagreement between the parties. In response to these comments, Mark's attorney circulated amended agreements on January 20, 2010, stating that "so far as we are concerned, you may circulate all documents for signature."

On February 8, 2010, Cowan again circulated the most recent versions of the various agreements—including the Interim Agreement, the Operating Agreement Outline, and various indemnity agreements. Nevertheless, the documents remained unsigned.[5]

Harry testified that, after receiving the February 8 email from Cowan, Mark approached Harry and Joel to discuss setting the Interim Agreement "on the side" and focusing on the Operating Agreement Outline. Harry stated that "as of that date going forward we treated each other as owners and members." Around this same time, the business began experiencing losses, and Harry testified that Joel, Mark, and he "agreed that [they] were in it for a third no matter what," referring to potentially covering quarterly business shortfalls. During their testimony, Joel and Mark disputed the notion that the parties ever agreed to conduct themselves per the Operating Agreement Outline. They claimed to have agreed to operate under the Interim Agreement until they were making enough money to pay for the lawyers to finish the Operating Agreement Outline. All agree

---

[5] The only agreement that was ever signed between the parties was a lease agreement. Only Mark and Joel signed the lease—Joel as the owner of the property. Harry claims he did not know about this agreement until the present litigation.

that, over the course of the next several months, the parties looked for ways to "make [the business] work" by cutting overhead expenses and closing more loans.

After two months with no action on the matter, Cowan again emailed Harry, Joel, Mark, and their attorneys on April 13, 2010. Cowan stated that he wanted to "take this opportunity to urge everyone to finalize and sign the transaction documents." He also presciently noted that in "the absence of signed documents, sorting out everyone's respective rights and obligations will be very difficult, to say the least." Harry testified that he was "not aware" of any action taken as a result of this email. Mark testified that the reason the Interim Agreement was never signed was because the business was not doing well, and the parties did not want to spend more money on attorney's fees. Joel attributed the failure to finalize the Interim Agreement largely to Ken and his attorney.[6]

The warehouse lines persisted as a source of friction. The parties seem to have intended to share exposure for these credit lines to some degree, but there was disagreement as to how to achieve equity. In late-October 2010, Harry emailed Mark and Joel to "remind" them that he could not "put [his] name on anything more than [one-third] of [a] [$]7.5 million" credit line. Again, in mid-November 2010, the parties had a conversation regarding another warehouse credit line. Via email, Harry once more expressed his discomfort with signing jointly and severally with Joel and Mark, as Harry believed this

---

[6] Cowan speculated that the parties might have wanted "some passage of time" before signing the agreements because they worried that Harry's creditors from Savings First might take action against him. Mark disagreed with this characterization, as Harry's issues had been resolved by April 2010.

would expose his greater assets to creditors. Harry stated that he would be willing to indemnify one-third of all business liabilities, but nothing more.

Mark responded to Harry's concerns by insisting that any "obligations need to be the same for all," and reminded the parties that there must be "equity regarding potential liabilities or the structure can not be equal." Joel characterized Harry's refusal to co-sign the credit lines as "chang[ing] the game in the middle" by refusing to join the others in guaranteeing these lines. Still, the parties looked for a way around this issue by asking Harry to set aside sufficient assets as collateral for his one-third indemnity share, or alternatively finding a non-member ongoing role for Harry. Cowan opined that, while it would be unusual for a typical employee to be expected to guarantee a line of credit, such a circumstance might not be unusual when that employee is expected to become an owner.

By the end of June 2010, Equity Mortgage Lending had begun to turn a profit and the parties decided to begin drawing a salary of $10,000 per month each. Harry described this distribution as an "advance on year end profits." Profits continued into the months of July, August, September, and October. At the end of the year, Harry, Joel, and Mark received W-2 forms from MAS. Harry was paid a total of $325,552 in 2010—Harry characterized this amount as a combination of salary, various profit distributions, and commissions. Though there is some disagreement as to the details regarding the negotiations, it appears the parties eventually settled on a 25/12.5/12.5 percentage split for commissions—with the party originating the loan receiving the larger portion. The other half of the gross profit was paid to the company.

After the year-end distribution of commissions and other income, Harry and Joel agreed to each contribute an additional $125,000 to increase Equity Mortgage Lending's net worth to $1,000,000. These payments were again paid to Saralee as a loan, who would in turn make a capital injection into the company in the same amount.[7] The loans were to be paid back in 30 days, or at the completion of the audit for which the capital injection was made. In a February 15, 2011 email, Harry requested to be reimbursed for this loan, and Mark replied that the parties needed to "sit down and discuss." Harry explained that he agreed to allow the money to remain in the company and maintains that he still has not been repaid for his $275,000 in contributions. Yet, according to Mark, the parties made these loans "as managers" and he testified there was no agreement that the money would be paid back. Likewise, Joel thought of these loans as "the cost of admission" into the company. Promissory notes for these loans were drafted but never signed.

As of November 22, 2010, the parties still contemplated becoming members, or "owners," of MAS and anticipated signing the Interim Agreement by the end of the year. In a December 10, 2010 email to Joel and Mark, Harry asserted that he had no problem signing the various agreements that had gone unsigned, but again brought up his dissatisfaction with the warehouse loans. In late-January 2011, Saralee, Ken, Joel, and Mark opened a $10 million warehouse line of credit. Once again, Harry refused to sign onto a joint-and-several obligation and only agreed to indemnify the parties for up to one-

___

[7] The purpose of this multistep process appears to be so that MAS would not have to report the payments as liabilities and could instead count them as capital contributions from Saralee and part of the equity of the company.

third of the obligation.  Around this time, Harry began frequently missing work and other obligations, such as scheduled meetings with Joel and Mark.  This made it difficult for the parties to make decisions about the business, especially regarding the warehouse line and potential indemnification agreements for Harry.

*Harry's Resignation*

In March 2011, Harry resigned from his position with Equity Mortgage Lending. He indicated that this was pursuant to his doctor's recommendation following months of mental health concerns, including depression and severe anxiety.  In an email dated March 20, 2011, Harry set forth an accounting of his requested compensation given his resignation—$275,000 reimbursement for loans paid to Saralee, commission from an in-progress loan closing, payment of health insurance premiums for two years, and, in the case of the sale of the company, 25% of the proceeds in year one and 15% in year two.  He did not think it would be "fair" to ask for any additional cut of sale profits.  Harry testified that he subsequently met with Joel and Mark, who agreed to repay the $275,000 in loans, but the terms of such a repayment remained unresolved.

Harry spent the first half of April 2011 attempting to arrange a meeting with Joel and Mark to discuss the specifics of his departure.  Eventually, Harry became frustrated with their inability to meet, and, on April 13, he emailed Mark and Joel stating that he was "retracting" his initial offer and turning the issue "over to [his] attorneys."  Harry's attorneys filed a complaint on October 28, 2011 in the Circuit Court for Baltimore County. While none of the agreements were ever signed, Joel and Mark both testified that they

ultimately signed an extension of the Interim Agreement before it was set to expire on November 30, 2012 and that it governed their conduct at the time of the hearing.

## Procedural Posture

In his complaint, Harry raised multiple claims. Most relevant here, however, are his claims for breach of contract and his request for a declaratory judgment asking for, *inter alia*, a determination of "the buyout price of his partnership interest" and a demand that the partners pay such price.

The trial court first issued its opinion from the bench. Regarding the breach of contract claim, the court stated that there could be no breach because there was no contract. Specifically, the court held that "there was never any meeting of the minds as to either the interim agreement or the operating agreement." Nonetheless, the trial court found that a partnership existed between the parties. It determined that the parties' conduct "exhibited what a partnership is" when they made management decisions together and contributed money equally. Consequently, the court awarded Harry $1,097,866—$793,000 base value, $260,712 in interest,[8] and $44,154 for commissions without interest.

In response to the defendants' February 20, 2015 Motion to Alter, Amend, or Revise Judgment, the trial court attempted to clarify its ruling. The court stated that the partnership "consisted of the combined mortgaged [*sic*] lending business, which was equally operated and owned by" Harry, Joel, and Mark. Yet, it also stated that there was "substantial

---

[8] The Circuit Court for Baltimore County later amended this award so that the ultimate interest paid would reflect a "rate of 10% per annum from the date of dissociation, March 10, 2011, until the date the payment is made."

13

evidence" that the partnership comprised "(1) Mr. Greenberg, (2) Mr. Wax, (3) Mr. Korotki, and (4) MAS Associates, LLC." It distinguished Harry, Joel, and Mark's role from MAS's role by stating that MAS provided its license in exchange for "rent, utility bills, and . . . additional funds necessary to operate the excluded businesses."

Mark and Joel appealed the decision to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court affirmed the trial court's ruling, holding that Harry, Joel, and Mark "entered into a joint venture for the short period of time between not signing the Agreement, and when they could not agree on the terms of a merger, or sign a new interim agreement." *MAS Assocs., LLC v. Korotki*, No. 228, Sept. Term 2015, 2018 WL 4575140, at *20 (Md. Ct. Spec. App. Sept. 21, 2018). Joel and Mark petitioned for *certiorari* in this Court, and we granted their petition.

## DISCUSSION

### Standard of Review

Pursuant to Maryland Rule 8-131(c), "[w]hen an action has been tried without a jury, the appellate court will review the case on both the law and the evidence." We will "not set aside the judgment of the trial court on the evidence unless clearly erroneous," giving "due regard" to the trial court's opportunity to "judge the credibility of the witnesses." *Id.* "If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous." *Webb v. Nowak*, 433 Md. 666, 678 (2013) (citations omitted). The "competent material evidence" standard has never required that the record lack even a modicum of evidence in support of the trial court's finding, as a literal reading of the words might suggest. *See Cassell v. Pfaifer*, 243

14

Md. 447, 454 (1996) (concluding that the evidence offered "lack[ed] that degree of substantiality which would require us to affirm the trial court" and the court's factual finding was, therefore, clearly erroneous); *Fuge v. Fuge*, 146 Md. App. 142, 180–82 (2002) (reversing a trial court's factual conclusion that a father lacked the "ability" to contribute to his children's private school tuition); *Banks v. State*, 8 Md. App. 182, 186–87 (1969) (reversing a trial court's factual conclusion where there was no "legally sufficient evidence" to support its determination). *See also Clearly-Erroneous Standard*, Black's Law Dictionary (11th ed. 2019) ("Under this standard, a judgment will be upheld unless the appellate court is left with the firm conviction that an error has been committed."). Rather, it is simply a highly deferential evidentiary review.[9]

The existence of a partnership based on the intent of the parties is an issue of fact, and, thus, it is reviewed using the clearly erroneous standard. *See Parkinson v. Parkinson*, 42 Md. App. 650, 657 (1979) ("A determination as to the intention of the parties is a determination of fact, which an appellate court is not at liberty to set aside or ignore unless it concludes that the finding is clearly erroneous.") (citation omitted). We review the evidence "in a light most favorable to the prevailing party." *Geo. Bert. Cropper, Inc. v.*

---

[9] This view is not only supported in our case law, but it is also the leading view in United States courts, most prominently articulated by the United States Supreme Court in *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."). This case was based on the Court's interpretation of the clearly erroneous standard as outlined in Federal Rule of Civil Procedure 52(a)(6), which provides: "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."

*Wisterco Invests., Inc.*, 284 Md. 601, 620 (1979). Still, the party alleging that the parties intended to form a partnership has the burden of proving that intent. *See Miller v. Salabes*, 225 Md. 53, 55 (1961) (citations omitted).

When a trial court decides legal questions or makes legal conclusions based on its factual findings, we review these determinations without deference to the trial court. *See Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 372 (2001) (citation omitted). "Where a case involves the application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." *Spaw, LLC v. City of Annapolis*, 452 Md. 314, 338 (2017) (citations omitted).

### Maryland Partnerships and Limited Liability Companies

In Maryland, Limited Liability Companies are creatures of statute formed in accordance with the Limited Liability Company Act ("LLC Act"). *See* Maryland Code Ann. (1992, 2014 Repl. Vol.), §§ 4A-101–1303 of the Corporations and Associations Article ("Corps. & Ass'ns"). The LLC Act was enacted to "give the maximum effect to the principles of freedom of contract and to the enforceability of operating agreements." *Id.* § 4A-102(a). To form an LLC, parties must execute articles of organization and place them on file with the relevant Maryland department. *Id.* § 4A-202(a). In practice, LLCs are governed by an operating agreement adopted by the members that specifies, *inter alia*, how the LLC shall be "managed, controlled, and operated"; how profits and losses are to be shared; rights of assignment; procedures for admission and dissociation of members; and meeting and voting procedures. *Id.* § 4A-402(a)(1)–(8).

The owners of an LLC are known as "members." *Id.* § 4A-101(m). Individuals can become members of an LLC only in the manner specified in the operating agreement or in Corps. & Ass'ns § 4A-601. In general, LLCs are either "member-managed"—meaning that the members retain active management duties—or "manager-managed"—meaning that the members delegate management authority to a manager or group of managers who are employees of the LLC. Unlike a partnership, no LLC member "shall be personally liable for the obligations of the [LLC], whether arising in contract, tort or otherwise, solely by reason of being a member" of the LLC. *Id.* § 4A-301.

A partnership is another form of business association, defined as "the unincorporated association of two or more persons to carry on as co-owners a business for profit . . . ." *Id.* § 9A-202(a). The provisions of the Maryland Revised Uniform Partnership Act ("RUPA") govern partnerships, unless these provisions are displaced in accordance with the title—typically through a written partnership agreement. *See id.* § 9A-104(a). Unlike LLCs, there are no formal requirements for the establishment of a partnership, as they can result whether the individuals expressly "intend[ed] to form a partnership and whether or not the association is called 'partnership,' 'joint venture,' or any other name." *Id.* § 9A-202(a). Still, an "unincorporated association or entity created under a law other than" RUPA or another state's partnership law "is not a partnership." *Id.* § 9A-202(c).

In the absence of formal agreement, "the existence of a partnership depends on the intent of the purported partners." Christine Hurt, D. Gordon Smith, Alan R. Bromberg & Larry E. Ribstein, *Bromberg & Ribstein on Partnership* § 2.04[A], at 2-29 (2d ed. 2019).

17

"As between the parties[,] partnership is a matter of intention[,] to be proved by their express agreement or inferred from their acts and conduct." *Morgart v. Smouse*, 103 Md. 463, 468 (1906). *See also Garner v. Garner*, 31 Md. App. 641, 647 (1976) ("A partnership *inter sese* cannot exist against the consent and intention of the parties, and their intention must be gleaned from proof in the case.") (citation omitted); *Queen v. Schultz*, 747 F.3d 879, 887 (D.C. Cir. 2014) ("Whether a partnership exists is an issue of fact, turning less on the presence or absence of legal essentials than on the intent of the parties gathered from their agreement, conduct, and the circumstances surrounding their transactions.") (citation omitted). Again, "[t]he existence of a partnership will not be presumed, but must be proved, with the burden of proving such existence resting upon the party having the affirmative of that issue," *Miller*, 225 Md. at 55 (internal citations omitted)—here, that means Harry. The evidence demonstrating partnership must "rise above surmise or speculation and reach the level of reasonable probability." *Geo. Bert. Cropper*, 284 Md. at 623 (citations omitted).

The Court of Special Appeals, in *Garner v. Garner*, 31 Md. App. at 648–49, approvingly quoted the trial court stating "a partnership, like any other contract, requires mutuality, a meeting of the minds and agreement, and it requires definite terms and specific intent among other things . . . ." Such an agreement, however, need not be written. *See id.* at 647. To determine whether a partnership was formed we observe the following rules: (1) joint tenancy or ownership of property "does not by itself establish a partnership"; (2) sharing "gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest" in the property generating the returns; and

18

(3) any person receiving "a share of the profits of a business is presumed to be a partner," unless such share is received in the payment of debt, wages or services rendered, rent, annuity or benefit, interest on a loan, or sale of a business or property. Corps. & Ass'ns § 9A-202(d)(1)–(3).

## Harry, Joel, and Mark's Intent to Form a Partnership

The trial court concluded that there was no enforceable written agreement and the parties do not challenge that determination here. Thus, we must decide, given the entirety of evidence produced at trial, whether there was competent material evidence for the trier of fact to fairly conclude that the parties formed a general partnership, according to Corps. & Ass'ns § 9A-202(a). As discussed above, this question is one of either overtly expressed intent, or actions that courts deem sufficient to establish such intent.

As a general matter, Joel and Mark argue that the trial court's ruling conflates two distinct forms of business entities: LLCs and partnerships. They state that the court erred in ruling that a lawfully formed LLC could simultaneously be the vehicle for operating a separate unnamed "combined mortgage lending business" partnership. In other words, they maintain that the court ignored the statutory language preventing organizations formed under other statutes from being partnerships, as provided in Corps. & Ass'ns § 9A-202(c), and treated MAS as a partnership. Harry responds that, under the trial court's ruling, "MAS was neither a partner nor the partnership." Thus, Harry states, Joel and Mark's argument "is based entirely upon [a] false premise."

While we agree with Joel and Mark that an LLC, itself, cannot simultaneously be a partnership, we also agree with Harry that it is not the overarching issue here. It is possible

19

to construct a circumstance in which the existence of a partnership[10] and an LLC are not mutually exclusive phenomena. Most relevant here, one could imagine a scenario where parties intend to become members of an existing LLC but abandon that attempt in favor of a partnership. It is also not inconsistent with the statutory language, *per se*, for an association conducting its operations in conjunction with an LLC to intend to form a partnership. The question is whether the parties have done so in this case, and, accordingly, we turn to a close analysis of the record.

*Negotiations to Form an LLC*

Joel and Mark point to *Ramone v. Lang*, No. Civ.A. 1592-N, 2006 WL 905347 (Del. Ch. Apr. 3, 2006),[11] and various other out-of-state cases, to illustrate their contention that parties should not be considered as having formed a partnership during ongoing negotiations to form an LLC. They state that "the parties were always working toward amending the 2004 Operating Agreement so that Harry, Mark, and Joel would eventually

---

[10] Unlike the Court of Special Appeals, we use the term "partnership," rather than "joint venture," because that was the term predominately used by the trial court. Moreover, "there is no real distinction between a joint adventure and what is termed a partnership for a single transaction." *Beard v. Beard*, 185 Md. 178, 185 (1945) (cleaned up).

[11] Pursuant to Maryland Rule 1-104(a), we do not rely on unreported opinions from Maryland courts as "precedent within the rule of stare decisis [or] persuasive authority." But when appraising the persuasive value of unreported opinions from other jurisdictions, we consider the value of these opinions in their local courts. In Delaware, unreported cases have precedential value and are citable without limitation. *See* Del. Sup. Ct. Rule 14(b)(vi)(B)(2). We consider this case as persuasive authority, bolstered by that fact that this Court frequently looks to Delaware cases in search of widely-regarded corporate legal jurisprudence. *See Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 338 n.14 (2009) ("This Court has noted the 'respect properly accorded Delaware decisions on corporate law' ordinarily in our jurisprudence.") (citation omitted).

20

become members of MAS . . . ." Thus, no partnership intent could have formed. Harry asserts that *Ramone* is inapplicable to the present case because the current parties "agreed to the material terms of their agreement and never had the stated intent to form their own LLC when they formed their partnership."

In 2006, then-Vice Chancellor Leo Strine, current-Chief Justice of the Delaware Supreme Court and noted corporate law scholar, authored *Ramone v. Lang* for the Court of Chancery of Delaware. In that case, two parties, Ramone and Lang, entered into discussions about their mutual interest in purchasing and operating a swimming center. *See id.* at *3. Ultimately, their discussions centered around the formation of an LLC and resulted in the circulation of a draft LLC agreement. *See id.* During these negotiations, the parties referred to each other as "partners," but, in the end, they were unable to come to agreement and Lang entered into an LLC agreement with other individuals to acquire the property. *See id.* at *9. Ramone filed suit claiming that the parties, through their conduct during negotiations, had formed a partnership and that he was entitled to a 50% interest in the property. *See id.*

The Court concluded that that there was no partnership between the parties in that case because "to find that their failure to reach accord on an LLC agreement, without more, left them as general partners would be inequitable and unprincipled, given the reality that they never agreed on their obligations to one another." *Id.* at *13. Rather, the parties' agreement was merely an engagement "to get engaged," which is not sufficient to form a general partnership. *See id.* at *12–13. Indeed, the Court opined that "it would be very odd to find that a general partnership existed because both Ramone and Lang seem to have

21

agreed that any binding relationship they would form as co-fiduciaries (rather than as lessor and lessee) would be as fellow members of an LLC." *Id.* at *13. "[W]hen parties clearly intend to effect a formal business relationship through a written [LLC] agreement rather than through a general partnership, that reality serves as an important factor that cuts against concluding that they had earlier formed a general partnership because their attempt to forge an agreement on the material terms of a written LLC contract eventually came to naught." *Id.*

The advent of the LLC as a business entity—part partnership and part corporation—surely introduces some ambiguity into our interpretive process. Nevertheless, courts have grappled with this issue and several have determined that it would be inequitable to construe arms-length negotiations between sophisticated parties to form an LLC concurrently as intent to form a partnership when those negotiations fail. *See Grunstein v. Silva*, C.A. No. 3932-VCN, 2011 WL 378782, at *10 (Del. Ch. Jan. 31, 2011) (typically, "a clear intention to form an entity other than a general partnership may strongly suggest that the parties did not earlier form a partnership"); Hurt, *Bromberg & Ribstein on Partnership* § 2.04[B], at 2-40 n.19 (listing *Ramone v. Lang* and other cases). *Cf. Garner*, 31 Md. App. at 644 (parties intended to form a partnership but could not be considered to have done so until the agreed upon circumstances had occurred).

Here, we see the same principle at play as in the cases above. During their first meeting together on October 13, 2009, Harry, Joel, and Mark laid the foundation for a plan that would result in each obtaining membership in MAS. Their goal to each obtain one-third interest in MAS remained consistent throughout their negotiations. Indeed, the parties

22

engaged in active negotiations regarding the Interim Agreement and the Operating Agreement Outline throughout their relationship. Their attorney circulated various versions for feedback beginning in October 2009 and ending in April 2010. It appears initially that Ken's attorney held up the signing of the agreements due to issues concerning Ken's profit distribution. But, after May 2010, it seems that it was a combination of anticipated financial woes and Harry's unwillingness to indemnify the warehouse lines that slowed negotiations. Still, the parties continued to negotiate. From July to December 2010, the parties discussed alternative arrangements for Harry's ownership, given his unwillingness to co-sign warehouse line guarantees. In December 2010, the parties stated that they hoped to have the Interim Agreement signed by the end of the year. In January 2011, the parties again disagreed about another warehouse credit line, delaying any potential deal. Around this time, Harry also began missing significant amounts of work due to his mental health, culminating in his resignation in March 2011.[12]

Harry makes much of the fact that MAS Associates, LLC already existed, but we see no reason why the circulation of a **new** LLC operating agreement should be treated as legally distinct from the circulation of an **amended** operating agreement. Both strongly evidence the parties' intent to acquire ownership of an LLC, not form a partnership. Harry, Joel, and Mark sought to come to an agreement that would make them all members of

---

[12] Though long, the timeline of the negotiations was anticipated by the parties. Based on the testimony adduced at trial, the parties contemplated that the pre-membership interim period could reasonably last for three years. This is supported by the parties' testimony and the fact that the Interim Agreement included an expiration date of November 30, 2012, three years after negotiations started.

MAS. In the meantime, they looked to form an Interim Agreement to regulate their conduct. As discussed at length below, this agreement contemplated Harry and Joel as being employees of MAS, not partners in a partnership operating through MAS. Harry never performed the conditions precedent necessary for his membership in MAS because he resigned before the agreement was complete. Nor did the parties ever agree to terminate their pursuit of membership. The parties' intent controls in such circumstances, and so long as their intent is to negotiate membership in an LLC, it cannot simultaneously be to form a partnership.

The most important factor in the present case is that the parties never abandoned their efforts to become members of MAS. Like in *Ramone*, "to find that their failure to reach accord on an LLC agreement, without more, left them as general partners would be inequitable and unprincipled . . . ." 2006 WL 905347, at *13. All evidence must be viewed under the shadow of the least ambiguous evidence presented to the trial court: the parties clearly expressed an unabandoned intent to become members of an LLC. Actions consistent with this mutual understanding cannot fairly contribute to an implied partnership.

*Management and Control*

One factor courts commonly look at to evaluate partnership intent is the management and control of the entity. *See* Hurt, *Bromberg & Ribstein on Partnership* § 2.06[C], at 2-81. Joel and Mark state that the parties' roles were consistent with being managers in a manager-managed LLC. They argue that referring to each other as partners, in the colloquial sense, is not indicative of partnership. Additionally, they assert that MAS

24

was the only entity through which the parties operated, as demonstrated by the fact that the purported partnership was never named, and consequently holds no licenses or bank accounts. Harry, of course, disagrees with these assertions. He states that the parties made decisions only after consulting each other and each had equal control in the management process. Harry points out that the parties were all signatories on the Equity Mortgage Lending bank accounts and referred to each other as partners, and employees referred to them as partners, to support his argument.

The trial court partially based its partnership conclusion on its finding that "each [party] maintained equal control over their business. No one made a decision without everybody else agreeing to it." Additionally, the court relied on its observation that Saralee was not involved in MAS's day-to-day operations and concluded that she "abandoned all control" of the company. As an initial matter, we reject the trial court's use of Saralee's non-existent management authority as a factor in favor of inferring partnership because such a conclusion is contrary to the express terms of the LLC Act and the 2004 Operating Agreement. Under the LLC Act, members can specify their intended LLC management structure in the operating agreement. *See* Corps. & Ass'ns § 4A-402(a). Section 4.1 of the 2004 Operating Agreement provides that "[n]o Member may take part in, or interfere in any manner, with the management, conduct or control of the business of the Company . . . ." MAS was a **manager**-managed LLC and Saralee had no obligation to be involved in the day-to-day operations of the company—in fact, she had an obligation to the contrary. Acting in accordance with the operating agreement cannot be used to support

25

intent to form a partnership, and the trial court's conclusion that Saralee's actions were "wholly inconsistent with that of [an] owner[]" is incorrect as a matter of law.

Indeed, the parties did make joint business decisions together, including: communicating to the employees together, setting company policy, making hiring and firing decisions, and making decisions regarding salary and bonuses for specific employees. This is also evidenced by the numerous emails containing "agendas" for their meetings together. Still, while equal control over the operations of an entity might be one sign of partnership, it is not determinative in and of itself. This sort of behavior is equally consistent with the typical high-level managerial duties of an LLC manager. As discussed above, Harry, Joel, and Mark were actively engaged in negotiations to become members of MAS—first becoming managers in accordance with the Interim Agreement. None of the above-listed actions are inconsistent with this expressed intent and, therefore, do not support a finding of an intent to form a partnership.

Nor does the use of words like "partner" or "owner" magically transform a given association into a partnership. *See Garner*, 31 Md. App. at 645 (parties' descriptions of their relationship as partners is more relevant to their relationship to third parties than their relationship between themselves). While these terms may give some sense of the parties' understanding about their relationship, here it is almost exclusively Harry who uses the word partner and we have little evidence, beyond silent acquiescence, that Joel and Mark referred to their relationship this way.[13] For these statements to be meaningful, there should

_____

[13] There are two occasions for which we have evidence that Mark and Joel used the word "partner." In a September 2009 email, before Mark joined the negotiations, Joel used

26

be some consistent **mutual** expression of partnership, rather than unilateral declarations or informal uses of the word. *Sewing v. Bowman*, 371 S.W.3d 321, 334 (Tex. App. Ct. 2012) (requiring that "there must be evidence that both parties expressed their intent to be partners") (citation omitted). The record does not contain sufficient evidence of such a mutual understanding. Moreover, we recognize the now-frequent colloquial use of the term "partner," unconnected to any legal meaning or intention.[14] Courts must be particularly wary of relying on this single word to inform our conclusions about the nature of a legal entity, when that word is used in common vernacular to refer to friends, colleagues, and cowboys, alike.

More significant than a colloquial use of the word partner is that the business licenses remained under the name of MAS Associates, LLC, and not a separate partnership entity, or the parties themselves. *See F & K Supply, Inc. v. Willowbrook Dev. Co.*, 304 A.D.2d 918, 920 (N.Y. App. Div. 2003) (fact that parties filed business certificate

---

the word partner to reference Harry. Additionally, Mark used the word partner in a November 2009 email. These two instances are insignificant in our view.

[14] "Referring to a friend, employee, spouse, teammate, or fishing companion as a 'partner' in a colloquial sense is not legally sufficient evidence of expression of intent to form a business partnership." *Ingram v. Deere*, 288 S.W.3d 886, 900 (Tex. 2009) (citation omitted). *See also Hoss v. Alardin*, 338 S.W.3d 635, 645 (Tex. App. 2011)

> [T]here was no evidence that using the word "partner" in the context of customer introductions like Alardin described would ordinarily be understood to have legal significance. Thus, we conclude that Alardin's evidence that he introduced Hoss to customers as his "partner," absent evidence to explain why the context of those introductions showed that the term carried legal significance, is no evidence of the second TRPA factor.

27

indicating the entity was a sole proprietorship was evidence against partnership). Not only were the parties not named in the business licenses, they actively surrendered their individual licenses. Additionally, the mere act of doing business as Equity Mortgage Lending, a registered tradename of MAS Associates, LLC, is evidence against the formation of a partnership. The parties openly promoted themselves to lenders and others as being part of MAS and Harry took no issue with doing so when he edited the "history" section of a MAS document they were using to secure credit lines. None of the parties protested holding out to the world that they were an LLC, and willingly operated under the rules of such an entity. Both of the above facts provide significant evidence that the parties did not intend to form a partnership separate from MAS.

Finally, it is a point of contention between the parties whether they indeed "opened" the Bank of America accounts, or were simply added as signatories. The trial court concluded that Saralee and Ken were not "authorized to sign" for the new accounts, but the evidence does not support this conclusion. In fact, the cover letter attached to the bank paperwork indicates the opposite—that Saralee opened the accounts and "authorize[d]" the parties "to be signers" on the MAS d/b/a Equity Mortgage Lending accounts. Even if Saralee and Ken—as members in a manager-managed LLC—were not authorized to draw from the accounts, we are hard-pressed to see how such an arrangement is indicative of "abandonment" by a member. And given the terms of the 2004 Operating Agreement, we conclude that it should not be.

Together, the evidence relied on by the trial court fails to tilt the scale from management duties to something suggestive of partnership. When the parties at issue are

28

also actively engaged in the process of negotiating to become members of an LLC, evidence of equal control and joint decision-making authority is not evidence of the parties' intent to form a partnership. Harry's mere claim of partnership is not a sufficient foundation for the trial court to find same.

*Capital Contributions to the Entity*

Another common factor courts use to determine whether parties intended to form a partnership is whether they made capital contributions to the endeavor. *See* Hurt, *Bromberg & Ribstein on Partnership* § 2.04[B], at 2.34. "[A] contribution to capital is generally understood to be a more permanent contribution to the partnership than a debt contribution, so that the capital contributor participates in the risks of the enterprise to a somewhat greater extent than does a creditor." *Id.* § 2.06[E], at 2-98. The trial court concluded that neither Saralee nor Ken "made any capital contributions," and that, while the parties may have termed the payments "loans," Harry, Joel, and Mark made "capital contributions for purposes of funding a new venture . . . ."

Harry uses his contributions of capital to argue that he is an "equal owner" of the entity formed with Joel and Mark. Both he, and the Court of Special Appeals, point to a quote from *Southern Can Co. v. Sayler*, 152 Md. 303 (1927), in which this Court quotes an old treatise distinguishing a loan and a capital contribution.

> Care must therefore be taken to discriminate between the cases of an alleged loan, with a share of the profits by way of interest, and a real partnership disguised as a loan; for **if it appears that the transaction is a mere device to obtain the advantages of a partnership, without the responsibilities, it will be held to be a partnership**, whatever the parties may have called it. The interest is usually to be found, according to later cases, in the

> powers of control of the alleged lender: Has he any voice or part in controlling the management of the business as a principal therein? Has he, by virtue of the arrangement, such an interest in the business that he can be regarded both as principal and agent for the others?

*Id.* at 320 (emphasis added). We are unconvinced by this language. Specifically, it is unclear what "advantages of a partnership" the parties would have been intending to gain when they characterized Harry's contribution as a loan. Rather, they were taking advantage of the LLC form when they did so, benefiting from its added liability protection and tax treatment—a business form that did not exist in 1927, when *Southern Can Co.* was decided.

Understanding the form of the payments at issue is essential to evaluating their classification as either loans or capital contributions. The alleged partners did not make three separate payments directly into a partnership account, or even directly to MAS. Instead, in late-November 2009, both Harry and Joel issued checks to "Saralee Greenberg" in the amount of $150,000 per person. Saralee then contributed $450,000 to MAS, including Mark's share. Again, in late-December 2010, Harry and Joel wrote $125,000 checks to Saralee, who, in turn, made a $250,000 contribution to MAS to increase its equity to over $1,000,000. The trial judge, considering the above evidence, concluded that even if the payment "was called a loan, . . . it was a **capital contribution** for purposes of funding **a new venture** . . . ." (Emphasis added.) This cannot be correct.

The form of the transactions belies the conclusion that the parties made capital contributions to a new entity. It is uncontroverted that the payments were made to Saralee, a MAS member, who then transferred them to MAS. This procedure is consistent with MAS's 2004 Operating Agreement, which requires capital contributions be made through

30

a member. Such an arrangement would **only** have been necessary if the parties intended to contribute capital to MAS, not to some new venture. Two conclusions are inescapable. First, this action is consistent with Harry, Joel, and Mark's expressed intention to become LLC members—a goal they were actively working toward at the time of the payments. These circumstances support a conclusion that the payments were made by expectant MAS members, to a current member, for the purposes of that member making a capital contribution **to MAS**.

More importantly, to treat Harry, Joel, and Mark's payments as capital contributions made through Saralee and MAS to their alleged partnership would be to impermissibly blur the lines between LLCs and partnerships in contravention of RUPA's express terms. Under RUPA, codified in Corps. & Ass'ns § 9A-202(c), "[a]n unincorporated association or entity created under a law other than [RUPA, former-UPA, or another state's partnership statute] is not a partnership." Thus, an LLC cannot simultaneously be a partnership, because it is formed in accordance with the formalities outlined in the LLC Act. The alleged capital contributions were made by Saralee, an LLC member, to "MAS Associates, LLC," not to a purported partnership. The trial judge treated these payments as if they were made to a partnership under the guise of capital contributions to an LLC. But to accept this conclusion would be to treat a capital contribution to an LLC as a capital contribution to a partnership—as if the entities were one-in-the-same—which is expressly prohibited by

31

Corps. & Ass'ns § 9A-202(c).  The court made an error of law when it concluded this was possible.[15]

In sum, the trial court erred as a matter of law when it characterized capital contributions to MAS as capital contributions to an unnamed partnership.  Such a conclusion is only possible if the LLC and partnership are considered the same entity, in contravention of Corps. & Ass'ns § 9A-202(c).  Thus, the evidence and law necessitate a finding that Harry, Joel, and Mark's payments were loans to Saralee, not capital contributions to an alleged new entity.  A loan is not evidence of partnership intent.

*Sharing of Profits and Losses*

Joel and Mark argue that any profits Harry received should be characterized as wages because "Harry was considered an employee of MAS Associates, LLC and received a W-2 form showing his wages."  The evidence, they assert, is merely consistent with MAS being a manager-managed LLC and Harry being a manager.  Moreover, they testified that the parties never agreed to share losses equally and that the evidence demonstrates Harry's

---

[15] We also consider Harry's own subjective understanding of the nature of the $275,000 in payments he made to Saralee.  Both of Harry's checks contain the word "loan" in the memo line and they are both addressed to Saralee, not MAS or a partnership entity.  Additionally, Harry's emails and testimony characterize the payments as loans and request prompt repayment—within 30 days of sending the money.  The short-term nature of the contribution belies its characterization as a capital contribution.  The parties also drafted promissory notes for both loans that were to govern repayment, although neither note was ever signed.  On other occasions, Harry had made short-term loans to MAS, confirmed via email, to MAS.  Some of these loans were repaid on December 22, 2010, the same day Harry made another $125,000 payment to increase MAS equity to over $1,000,000.  Moreover, Harry, a sophisticated operator in the world of mortgage lending, would be able to identify a loan when he saw one.  The evidence clearly establishes Harry's subjective understanding that the separate $150,000 and $125,000 transactions were loans, contrary to the trial court's conclusion.

32

unwillingness to share MAS's liabilities equally. Harry, on the other hand, states that he received a share of profits, not wages, and, therefore, RUPA presumes him to be a partner. He claims that the parties took "draws" on profits in the amount of $10,000 per month and shared profits, though not commissions, equally. The fact that he was paid in W-2 wages, states Harry, does not make the payments employment wages.

The trial court concluded that Harry, Joel, and Mark shared profits equally. In total, Harry received $325,552 in wages from MAS in 2010, as reported on his W-2 form and in his Form 1040 tax filing. This amount included the twelve $5,000 twice-monthly payments, $81,052 in commissions, a December 15 payment of $120,000, and a December 30 payment of $64,500. Although it is unclear precisely which portion of his salary the court determined to be "profit," it likely based this conclusion on the latter two payments: the $120,000 payment made to all three parties and the $64,500 payment made only to Harry and Joel. Harry claimed that the $64,500 payment was made to Saralee in lieu of Mark, but "it came up a little bit short." Saralee indeed received a $58,695 check on January 13, 2011 with "Year End Distribution" in the memo line.

Again, Corps. & Ass'ns § 202(d)(3) states that a "person who receives a share of the profits of a business is presumed to be a partner in the business," unless the profits can be alternatively characterized. One of those alternative characterizations is as payment for "services rendered as an independent contractor or of **wages or other compensation to an employee**[.]" Corps. & Ass'ns § 9A-202(d)(3)(ii) (emphasis added).

Harry failed to establish that the $5,000 twice-monthly payments should be considered profit sharing, rather than a salary, which can be a share of gross revenue,

33

referred to as "gross returns" in Corps. & Ass'ns § 9A-202(d)(2).[16]  In *Ingram v. Deere*, 288 S.W.3d 886, 898–99 (Tex. 2009), the Supreme Court of Texas drew a distinction between the two terms.  To support its characterization of payments as coming from gross revenue, as opposed to profits, the Court noted that "there [was] no evidence that Deere's share would have decreased if expenses grew or increased if expenses shrank."  *Id.* at 899.  Thus, the payments were more like normal salary and less like shares of profit.  Likewise, from July through December 2010, Harry, Joel, and Mark received twice-monthly $5,000 payments, notwithstanding the fluctuation in profits during that time.  Additionally, these payments were made regularly and denoted as "salary" on MAS's payroll journal.  These payments were compensation and do not contribute to any presumption of partnership.

Moreover, the evidence is overwhelming that the parties intended to become employees of MAS during the interim period before membership, and such an arrangement weighs heavily against a presumption of partnership.  Even as of the first meeting between the parties, as evidenced by the meeting summary prepared by neutral attorneys, they contemplated Harry and Joel becoming MAS employees during the period before they were to become members.  The initial meeting summary specifically stated that Harry and Joel were "entitled to receive W-2 compensation equal to 1/3 of the profits of the 'origination division' of the Company"—essentially what the parties ultimately received.  The Interim Agreement, drafted after this meeting, contained nearly identical terms.  While

---

[16] Profit is the "excess of revenues over expenditures in a business transaction." *Profit*, Black's Law Dictionary (11th ed. 2019).  Whereas revenue is the total "income from any and all sources." *Revenue*, Black's Law Dictionary (11th ed. 2019).

34

these documents were not binding, they evidence the parties' thinking and intent. Joel, Mark, and Cowan each testified that the employment relationship was to provide the parties with protection against Harry's creditors and to give the group time to change over licensures and begin to make money. Joel also described himself as an "employee of MAS Associates" at all times during the negotiations and during his testimony.

Harry points to no other documents to support a determination that he and Joel were partners in a partnership, and not MAS employees who were managers. Nor do we find any. Rather, the documentary evidence supports the opposite conclusion. The paperwork filed with Bank of America authorizing Harry, Joel, and Mark to be signatories on the Equity Mortgage Lending accounts describes Mark as the President of MAS and Harry and Joel as the Vice Presidents. A November 2010 Consumer Bank warehouse credit line application also lists Mark as the CEO of MAS and Harry and Joel as managers of the company. Moreover, Harry was listed as a "Manager" of MAS Associates, LLC in the Nationwide Licensing System Consumer Access database. Significantly, he is also correctly described as the previous "President and Managing Member" of Savings First in the same document. The above evidence severely undercuts the trial court's determination that the parties ever intended that Harry and Joel be anything but employees during the interim period.

Most importantly, both MAS and Harry, Joel, and Mark treated all payments as wages, not profits. First, all payments were part of MAS's wage calculation on the W-2s sent to Harry, Joel, and Mark, which included all withholdings typical of wage payments. Each party also reported the payments as part of their wages on their Form 1040 tax returns

35

in 2010, and none of the men filed a K-1 schedule reporting any profits from MAS. On MAS's payroll system, the payments were classified as "commission," and on November 22, 2010, Mark and his attorney referred to the payments as "bonuses." Executive compensation packages often include a percentage of profits, and, in fact, such an arrangement was contemplated in the Interim Agreement, which states that the parties are "entitled to receive W-2 compensation equal to 1/3 of the profits of the 'origination division' of the Company." According to MAS's 2010 tax returns, the LLC made $160,234 in income, meaning that not all of the "profits" were distributed to the alleged partners. Moreover, Saralee reported receiving $145,813 in profits from MAS Associates, LLC on her K-1 schedule—exactly 91% of MAS's profit. In short, both MAS and the parties treated their income as wages, not profits, in line with the written contemplations of the parties during their negotiations to become LLC members. Receipt of wages does not support a finding of partnership.

Additionally, Harry never intended to be equally liable for the debts of the purported partnership, as demonstrated by his resistance to being held jointly and severally liable for loans. Harry's insistence on capping his liability at one-third is inconsistent with a general partnership structure, in which, except in limited circumstances, "all partners are **liable jointly and severally** for all obligations of the partnership." *See* Corps. & Ass'ns § 9A-306(a) (emphasis added). Parties can change this structure by agreement as it relates to the

36

partners—i.e., substituting a one-third indemnity for joint and several liability[17]—but they never reached such an agreement. Harry both refused to co-sign the warehouse line along with the other parties—as well as rejecting other similar agreements—and never signed an indemnity agreement covering his share of the liabilities from that line, or any other.

In sum, while there is some competing testimony as to the nature of these payments, the *post hoc* perception of the parties as to whether the payments should be now characterized as profits or wages carries precious little weight. This is especially true when considered in light of the abundant documentary evidence demonstrating that all payments to the parties were treated as wages. To the extent that the trial judge applied any presumption of partnership, it was an error of law to do so, because the payments were "wages or other compensation to an employee," according to Corps. & Ass'ns § 9A-202(d)(3)(ii). Without such a presumption, the mere receipt of compensation tied to profits is not indicative of partnership, nor does it demonstrate "co-owner[ship]," under Corps. & Ass'ns § 9A-202(a). There is such meager evidence in support of the notion that these payments were shares of profits that the trial court's conclusion otherwise was clearly erroneous—especially when considered in light of the parties' ongoing efforts to become members of the LLC.

---

[17] This is possible, so long as the agreement does not "[r]estrict the rights of third parties," in violation of Maryland Code Ann. (1997, 2014 Repl. Vol.), § 9A-103(b)(10) of the Corporations and Associations Article.

**CONCLUSION**

Harry had the burden of producing sufficient facts to conclusively demonstrate the parties' intent to form a partnership. *See Miller*, 225 Md. at 55. Evidence of equal control and joint decision-making authority, under these circumstances, does not support a conclusion of partnership. Further, the trial court erred as a matter of law when it classified Harry's $275,000 in payments to Saralee as capital contributions, as opposed to loans. Nor can the wages the parties received be considered profits, here. First, any presumption of partnership based on profit sharing is undone by the parties' expressed, simultaneous, and unabandoned intent to become members of MAS and their treatment of the payments as wages. Payments classified as wages are not supportive of partnership. Moreover, Harry actively resisted being held jointly and severally liable for the debts of the purported partnership. For these reasons, even reviewed in the light most favorable to Harry, the record still lacks the necessary competent material evidence to conclude that the parties intended to form a partnership.

Thus, we hold that the trial court's finding to the contrary was clearly erroneous, and reverse and remand to the Court of Special Appeals, with instructions to remand to the Circuit Court for Baltimore County to adjust the damage award in a manner consistent with this Opinion.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AS TO FINDING OF PARTNERSHIP. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND**

38

**REMAND TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS, CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.**